vise or bequest is void. Such is the unbroken current of decisions in this and all other states which have not adopted the statute of charitable uses of 43 Eliz.

I need only refer, in support of this, to the following cases: Dashiell v. Attorney General, 5 Har. & J. 398, 6 Har. & J. 7; Baptist Ass'n v. Hart's Ex'rs, 4 Wheat. [117 U. S.] 1; Wheeler v. Smith, 9 How. [50 U. S.] 76; and to the case of Meade v. Beale [Case No. 9.371], decided in this court by my brother, the chief justice. In that case, a bill was filed in this court by the complainants, who represented "the Education Society of Virginia," to enforce a bequest "to the Education Society of Virginia for the benefit of the theological students at the Protestant Episcopal Theological Seminary, near Alexandria, in the District of Columbia. The chief justice decided that the bequest in that case was void by the laws of this state; and even if the Education Society had been incorporated and competent to become a legal trustee, the description of the cestui que trusts was so vague and indefinite, that it would be impossible for the court to enforce or supervise the execution of the trust. This view of the law relieves me from the necessity of considering the argument of the complainant's solicitor, in reference to the right and capacity of "the Trustees of the General Assembly of the Presbyterian Church in the United States of America" to receive and take all bequests made to "the General Assembly's Board of Missions," a body not incorporated and not now in existence; or to the right of the original complainants to enforce a bequest made to the "General Assembly's Board of Missions."

Being of the opinion, therefore, that this bequest in Miss White's will is void for the reasons I have given, I will sign a decree dismissing the bill filed in this case, with costs.

---

BOATMEN'S SAV. INST. (DARBY v.). See Case No. 3,571.

---

## Case No. 1,587.

### The BOB CORNELL.

[See Monongahela Nav. Co. v. The Bob Connell, 1 Fed. 218.]

---

BOBO (MALTBY v.). See Case No. 8,998.

---

## Case No. 1,588.

### The BOBOLINK.

[6 Sawy. 146.][1]

District Court, D. California. Dec. 9, 1879.

CARRIERS' LIABILITY — GOODS DAMAGED BY SEA PERILS—REFUSAL OF CONSIGNEES TO ACCEPT.

Where wool arrived damaged; and in a perishing condition, from causes for which the carrier

was not responsible, and the consignees declined to receive it, and it was subsequently sold by the carrier to prevent its perishing on his hands: Held, that the carrier's duty and liability terminated on the discharge of the wool, and reasonable notice and opportunity given to the consignees to take it away. He thenceforth became a compulsory bailee of the goods, bound only to such reasonable care as a prudent and honest man would take of property of which he has become the involuntary custodian.

In admiralty.

Taylor & Haight, for libelants. James C. Perkins, for claimants.

HOFFMAN, District Judge. I see no ground on which the libel in this case can be supported. The wool in question was shipped "to be carried on deck at the owner's risk." It was injured during the voyage by reason of its exposed situation, and by one of the perils of which the shipper took the risk. The stowage was as careful and safe as under the circumstances was practicable. The vessel on her arrival was hauled into a slip, and the discharge commenced and prosecuted with reasonable and customary diligence. The wool was discharged on Thursday afternoon, and the libelants were notified of the fact on the next morning. They were already aware of the vessel's arrival, but had neither presented their bill of lading, tendered the freight, nor demanded their goods. They seem to have been notified as soon as in the usual course of business was practicable, and as soon as the fact was known that the marks on the packages ("M. & F.") indicated that they were the consignees. They refused to receive the wool, on the ground that the liability to them of the insurers was in dispute. As the wool was rapidly deteriorating in value, the agents of the vessel became alarmed lest it should utterly perish on their hands. They therefore endeavored to have it scoured, which it seems was indispensable to arrest the destructive processes which were going on. They found great reluctance on the part of persons engaged in the business of scouring, to undertake the operation, and a price was asked which seemed to the expert whom they employed to be exorbitant. The latter therefore concluded to accept an offer to purchase it from a party who owned a scouring mill. This disposition of the wool was made in perfect good faith, and under the conviction that it was the most advantageous arrangement that could be made for the interest of all concerned. The sale was made on Saturday. To save the wool it was necessary to keep steam up in the mill during Saturday night and Sunday, and to employ workmen at extra wages to conduct the operation. Its condition admitted, or was supposed to admit, of no delay. Had it been left unattended to until the succeeding Monday or Tuesday, its value would have been greatly impaired, perhaps wholly destroyed.

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]